## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL S. BOWERMAN, D.C.,      :
                            :     CIVIL ACTION
             Plaintiff,       :
                            :
     v.                      :
                            :     NO.    13-3345
NATIONAL LIFE INSURANCE    :
COMPANY                   :
                            :
            Defendant.     :

## <u>MEMORANDUM</u>

BUCKWALTER, S.J.                               December 16, 2014

       Currently pending before the Court is Defendant National Life Insurance Company

("Defendant")'s Motion for Summary Judgment as to all claims asserted by Plaintiff Daniel S.

Bowerman, D.C. ("Plaintiff"), as well as Plaintiff's Motion for Summary Judgment as to all

claims asserted.  For the following reasons, Defendant's Motion for Summary Judgment is

granted and Plaintiff's Motion for Summary Judgment is denied.

## I.  FACTUAL HISTORY[1]

Plaintiff, as the owner of Daniel S. Bowerman, D.C., established and maintained for himself and at least one other common law employee Disability Income Policies issued by Defendant, including the Disability Income Policy numbered D1889083 issued to Plaintiff on March 22, 1984.  (Def.'s Statement of Facts 4, Ex. 3, Disability Income Policy No. D1889083, with Riders ("the Policy").)  The Policy provides coverage for Total Disability and also contains a Rider for Residual Disability Income Benefit (the "Rider").  (Id.)  The Policy is non-cancellable and guaranteed continuable, and Defendant itself is not permitted to "change any of its terms" because "[a]ny change may be made only by one of our authorized officers or registrars" and "[t]he change must be written and attached to the policy."  (Id.)

The Policy defines Total Disability as follows:

> **Total Disability**.  The Insured shall be deemed totally disabled only if the Insured:
> 1.  is unable to perform the material and substantial duties of an occupation due to:
>    a. accidental injury; or
>    b. sickness; or
> 2.  has sustained the complete and irrevocable loss of:
>    a. sight; or
>    b. hearing; or
>    c. speech; or

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.  For ease of reference, citations for undisputed facts and their supporting exhibits are primarily taken from Defendant's Statement of Facts and its accompanying seventy-seven tabbed exhibits, rather than from Plaintiff's exhibits, which contain groups of multiple documents, identified by Bates-Stamped numbers, behind each of the eleven tabs, plus an additional supplemental exhibit twelve.  To the extent either party has included in its Statement of Facts items which are not germane to the determination of the parties' summary judgment motions, they are omitted from the already lengthy recitation of facts in this Opinion.

> d. use of both hands, or use of both feet, or use of one hand and one foot.
>
> **Until an income benefit, for any period of continuous disability, has been paid to the Insured's 55th birthday, or for 120 months, whichever is longer, occupation means the occupation of the Insured at the time such disability begins. Thereafter it means any occupation for which the Insured is or becomes reasonably fitted by education, training or experience.**[2] Due regard shall be given to vocation and earnings at the time such disability began. To be deemed totally disabled, the Insured must be under the prudent care of a licensed physician. The physician must be someone other than the Insured. The Insured need not be under such care if disabled under item 2 above.

(Id. at 4–5, Ex. 3 (emphasis added).)

The Rider, which is attached to and made part of the Policy, provides that:

> We, National Life Insurance Company, will pay the benefits set forth below while this rider is in force, subject to the terms of this rider.
>
> . . .
>
> **This rider, while in force, and the policy shall be treated as one instrument. The terms of the policy shall apply to this rider unless the rider states otherwise.**
>
> . . .
>
> ### DEFINITIONS
>
> **Partial Disability**. The Insured shall be deemed partially disabled only if, due to accidental injury or due to sickness, the Insured is not able:
>
> 1. to perform one or more of the important daily duties of the **Insured's occupation as defined in this policy**; or
> 2. to engage in the **Insured's occupation as defined in this policy** for as much time as was usual prior to the start of disability.
>
> For the Insured to be deemed partially disabled:

---

[2] This sentence is referred to throughout as the "change in definition" provision.

3

    1.        such disability must result in a Loss of Earnings per Month of at least 20% of the Adjusted Prior Average Earnings per Month; and

    2.        the Insured must be under the prudent care of a licensed physician.  The physician must be someone other than the Insured.

**Periods of Continuous Disability**.   The manner in which we determine:

    1.        periods of continuous disability prior to and after the Benefit Start Date; and

    2.        periods of separate disability;
shall be the same **as set forth in this policy**.  However, days of disability may be days of partial disability.

**Earnings per Month**.  Earnings per Month means:

    1.        all wages, fees and other pay earned by the Insured in a month for work by the Insured; less

    2.        usual and customary business expenses except any income taxes.

(Id. at 5–6, Ex. 3 (emphasis added).)  The Policy also contains a Waiver of Premium provision, which provides that:

**Waiver of Premium**.  We will waive the payment of premiums while the Insured is continuously totally disabled due to accidental injury which occurs or sickness which is first treated or diagnosed while this Policy is in force.  Such continuous total disability must have lasted for 90 days.  We will refund:

    1.        any premiums paid during such periods of total disability; and

    2.        the portion of any premium paid prior to such period for coverage within the period.

(Id. at 6–7; Ex. 3.)

On or about February 9, 1990, Defendant received a Claimant's Statement signed by Plaintiff, then age 33, seeking disability benefits after being injured by falling off his bicycle on October 14, 1989, when he suffered a "third degree acromioclavicular separation."  (Id. at 7, Ex. 5.)  On the date Defendant received the Claimant's Statement, Plaintiff provided a Professional

Occupation Description wherein he identified his profession as "Doctor of Chiropractic," with a specialty in "Chiropractic Orthopedics."  (Id., Ex. 6.)  An Attending Physician Statement signed January 9, 1990 by Dr. Basil Snyman, Chiropractor, listed Plaintiff's diagnosis and concurrent conditions as of January 9, 1990 as: "1) third degree acromioclavicular separation, post-traumatic; 2) hematoma, left hip, resolved by aspiration; 3) subluxation, 2nd and 3rd rib on left (resolving); and 4) subluxation, thoracic spine (resolving)."  (Id., Ex. 7.)  Dr. Snyman wrote that Plaintiff had been partially disabled from "10/15/89" through "present" and stated the following:

> Condition has been aggravated by working, a business trip taken early November[3] and sleeping on his affected shoulder.  *Note regarding total disability: patient did not have a <u>continuous</u> period of total disability, as he felt he needed to be in his office to treat his patients in whatever capacity he could, given his injuries.  However, in the 3–4 week period following his accident, he was unable to work at all for at least several days each week that were normal working days for him.  Substitute doctors filled in for him on these days.  The reasons for his total disability on these days were pain, fatigue and the inability to perform routine chiropractic manipulation.

(Id. at 7–8, Ex. 7.)

On February 14, 1990, Defendant received Consultation Notes from Arthur R. Bartolozzi, M.D., who saw Plaintiff on October 17, 1989, a few days after the accident.  (Id. at 9.)  Dr. Bartolozzi reported that Plaintiff:

> Fell off his bike while riding on West River Drive sustaining an injury to his left shoulder, he is right hand dominant.  He was seen in the E.R. where a grade III separation was diagnosed. . . .

---

[3] After Defendant was advised by its Philadelphia agency that Plaintiff had been involved in a bicycle accident, and prior to receiving Plaintiff's Claimant Statement, Defendant sent a Field Representative to make an unannounced visit to Plaintiff's office on November 2, 1989.  (Def.'s Statement of Facts 8, Ex. 8, Field Representative Memo to File.)  Plaintiff's secretary stated that Plaintiff was "out of the country at a medical convention," and Plaintiff's wife told Defendant's representative that while Plaintiff was unable to work as a chiropractor, he was capable of traveling and elected to attend the conference.  (Id.)  Plaintiff's wife told the representative that Plaintiff was taking a conservative approach of immobilization and that he was hopeful there would be no permanent disability.  (Id.)

> Physical Examination: Examination reveals that there is an area of
> abrasion over the left shoulder.  Gentle jogging of the shoulder
> produces pain.  There is also point tenderness of the AC joint with
> an obvious deformity.

(Id., Ex. 9.)  Dr. Bartolozzi diagnosed a "Grade III AC sprain" and "recommended a sling as

needed for symptomatic relief, avoidance of exertional activities until the pain resolves, and

return [as needed]."  (Id.)

Defendant wrote to Plaintiff on October 24, 1989, advising him that pursuant to the

Policy, his Benefit Start Date would be his sixty-first day of disability and explaining the

benefits, including the residual disability benefit he would receive if found partially disabled.

(Id., Ex. 10.)  In a Claimant Statement signed on March 14, 1990, Plaintiff claimed he had been

partially disabled from the date of the bicycle accident through the date of the Claimant

Statement, and reported his injuries as including the AC separation [sprain] and residuals from

the hip hematoma and upper back pain.  (Id., Ex. 11.)

On April 24, 1990, Defendant made its initial payment of residual disability benefits to

Plaintiff under a full reservation of rights and with no acknowledgment of liability.  (Id. at 9–10.)

On May 25, 1990, Defendant made an additional payment and sent Plaintiff a letter explaining

certain problems Defendant found with the financial data Plaintiff provided.  (Id. at 10, Ex. 12.)

Defendant paid benefits to Plaintiff while certain matters concerning his claim were resolved and

while Plaintiff continued to work as a chiropractor, though less than he did prior to his bicycle

accident (id. at 11–29), and ultimately paid to Plaintiff a total of $1,295,812.80 in disability

benefits over a 21-year period.[4]  (Id. at 1.)

---

[4] Defendant included various facts, supported by exhibits from the Administrative Record,
regarding Plaintiff's workload, the extent of his physical recovery from the 1989 bicycle
accident, the level of treatment he was receiving at various points in time, a subsequent bicycle
accident, an incident where Plaintiff fell down the stairs after tripping on a cat toy, an injury
Plaintiff sustained while exercising, a brief period of total disability when Plaintiff sought

Beginning in 1994, Plaintiff also worked in a Medicolegal business.  (Id. at 25.)  As of June, 2011, Plaintiff was working thirty hours per week as an Associate Medical Director, Chiropractic, for Independence Healthcare Management-Independence Blue Cross.  (Id. at 25, Ex. 58.)  Plaintiff was continuing in his reduced chiropractic practice a few days a week, and was still doing Medicolegal Consulting work a few hours per week.  (Id.)  In January 2008, Plaintiff reported that he was working full-time as a Medical Director, with extra hours and overtime, for Independence Blue Cross, and was working two hours per week in his Chiropractic business.  (Id. at 26, Ex. 60.)

The first reference to a change in definition of disability in Plaintiff's file appeared on November 5, 1998, when Defendant referred Plaintiff's file to the Special Handling Unit for reduced handling and specifically noted the change in disability definition review which would approach at age fifty-five.  (Id. at 24, Ex. 52.)  On the same day, Defendant wrote to Plaintiff and informed him that the reservation of rights had been removed from his benefits, that his file was being transferred to a reduced handling unit, and that the reduced handling unit would require Progress Statements two to three times per year.  (Id., Ex. 53.)  An activity record dated November 19, 2010 noted that a full file review could be undertaken in July 2011 because of the change in definition from "own occ[upation]" to "any occ[upation]" in the Policy.  (Id. at 27, Ex. 62.)  Plaintiff's file was assigned for a change in definition at age fifty-five review on January 31, 2011.  (Id., Ex. 63.)

---

treatment for substance abuse, other jobs Plaintiff held, and issues Defendant's employees had with the methods Plaintiff and his wife used in bookkeeping and submissions related to Plaintiff's claim, among other issues.  (See Def.'s Statement of Facts 10–29 and supporting exhibits.)  Plaintiff objected to the inclusion of most of this information in his Response in Opposition to Defendant's Motion for Summary Judgment.  (See Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 1–14.)  As discussed below, the parties' Motions for Summary Judgment can be decided on the basis of the language of the Policy and the Rider, and, accordingly, a lengthy recitation of these facts is not necessary.

On February 8, 2011, Jason Garry ("Garry"), Lead Disability Benefits Specialist, to whom Plaintiff's file had been reassigned, made a notation in the electronic claim file's Claim Action Plan: "[Change in definition] takes effect on July [redacted date of Plaintiff's birthday] 2011; will assess whether the [insured] is [totally disability] [sic] in his own occ at this time; we are handling claim under the [residually disabled] provision, which has no change in definition." (Pl.'s Statement of Facts 6–7; Ex. 1 (20).)[5]  On June 7, 2011, in his next entry, Garry wrote "[b]ased on our vocational assessment; we have determined that the [insured's] current occupation as a Medical Director would be reasonably fitted for the position given his education, training, and experience.  The [insured's] earnings from this work would be comparable with his pre-disability earnings.  The [change in definition] review has been completed."  (Id.)

Garry wrote to Plaintiff on February 14, 2011, to alert him to the change in definition, and in that letter quoted the change in definition provisions of the Policy.  (Id., Ex. 64.)  Among other topics addressed in the letter, Garry wrote that "we have been administering your claim under the Residual Disability provision of your policy.  At this time, we are determining your eligibility under both the Total Disability and Residual Disability provisions of your policy." (Id.)  Garry also requested that Plaintiff provide Defendant with certain medical and employment records related to the ongoing handling of Plaintiff's claim.  (Id.)  On March 18, 2011, Garry wrote to Plaintiff in response to Plaintiff's March 8, 2011 letter requesting clarification regarding Plaintiff's employment as a Medical Director in relation to his chiropractic practice.  (Id. at 28, Ex. 67.)  Garry wrote that Defendant's request for information about Plaintiff's earnings from his various jobs was needed in order "to assess whether the level of your involvement with your chiropractic practice would still find you eligible under the Residual Disability provision of your

_____

[5] As Plaintiff has included multiple documents behind certain exhibit tabs, the exhibit number refers to the tab and the number in parentheses refers to the Bates-numbered page of the document behind that tab.

policy.  If not, then you may be eligible under the Total Disability provision of your policy."
(Ex. 67.)  The letter went on to state that "[i]f we find you to be totally disabled, then the above
change [in the quoted language from the Policy] within the definition of total disability will
occur on your 55th birthday . . ." and noted that "if we do find you to be totally disabled, we then
would still require that the information be submitted based on the change in definition under the
Total Disability provision [as detailed in the letter]."  (Id.)

      Garry wrote to Plaintiff again on March 28, 2011, in response to a letter Plaintiff wrote
on March 23, 2011, asking Garry to provide him with the language in the Policy that specifically
addresses "level of involvement" in relation to Plaintiff's chiropractic practice.  (Def.'s
Statement of Facts Supp. Mot. Summ. J. 28, Ex. 69.)  Garry noted that while the Policy did not
contain that specific phrase, Defendant viewed the question as "relevant in determining your
ongoing eligibility under the Residual Disability provision."  (Id.)  Garry explained that
Defendant was requesting further information about Plaintiff's various areas of employment in
order to understand whether "the decline in revenue and income" from Plaintiff's chiropractic
business "is a result of your ongoing medical condition."  (Id.)  Garry also explained that if
Plaintiff were found eligible under the Total Disability provision of the Policy, Defendant would
assess Plaintiff's earnings from Independence Blue Cross as a Medical Director in addition to
those from the chiropractic business.  (Id.)

      As of May 27, 2011, one of Defendant's representatives confirmed with Plaintiff during a
field visit that Plaintiff was working two hours per week in his chiropractic business and was
employed full-time as a Medical Director with Independence Healthcare Management-
Independence Blue Cross.  (Id. at 29, Ex. 72.)  On June 7, 2011, a Senior Vocational
Rehabilitation Consultant performed a Vocational Assessment in advance of Plaintiff's fifty-fifth

birthday and concluded that Plaintiff was working full-time as a Medical Director for Independence Blue Cross, treating two to eight patients per week in his chiropractic practice, and giving five lectures a year across the United States in his Medicolegal business.  (Id. at 30, Ex. 73.)  The Consultant found Plaintiff's Medical Director position to be the one for which he was reasonably fitted given his education, training, and experience, and noted that the earnings from that position would be commensurate with his pre-disability earnings.[6]  (Id.)

Because an adverse claim determination, in this case a termination of residual disability benefits at the change of definition of disability at age fifty-five, was being made, Defendant initiated a Quality Compliance Consultant Review on June 9, 2011, which was completed on June 13, 2011.  (Id., Ex. 74.)  The Director found that the file met quality and compliance criteria and that Plaintiff was not eligible for further residual disability benefits after his fifty-fifth birthday because he no longer met the definition of disability in the Policy.  (Id.)  Furthermore, Plaintiff was engaged in another occupation for which he was suited given his education, training, and past work experience.  (Id.)

Defendant sent Plaintiff a letter dated June 16, 2011, which advised him of its determination that it would not be continuing his residual disability benefits beyond his fifty-fifth birthday, the date which marked the change in definition of disability, as he no longer met the definition of disability for those benefits and was no longer eligible for them because

> [a]fter you have been on claim for 10 years, or reached age 55, [whichever is longer] to be eligible for ongoing benefits you need to be unable to engage in any occupation for which you are reasonably fitted by education, training or work experience.  Since you are able to work full time in another occupation [Medical Director at Independence Blue Cross] that you are fitted by education, training or experience, you are no longer eligible for benefits once you attain age 55.

---

[6] Plaintiff states that his employment with Independence Blue Cross ended in June 2012.  (Pl.'s Ex. 12, Declaration of Daniel Bowerman, D.C., Sept. 3, 2014.)

(<u>Id.</u> at 31, Ex. 75.)  The letter also explained Plaintiff's ability to appeal the decision and

summarized the information from the administrative record that Defendant believed supported its

determination.  (<u>Id.</u>)

Six months later, on January 11, 2012, Plaintiff appealed Defendant's determination.[7]

(<u>Id.</u> at 31, Ex. 76.)  Defendant's determination was upheld and Defendant's Lead Appeal

Specialist wrote to Plaintiff on January 30, 2012, summarizing the information supporting the

decision, quoting the applicable Policy provisions, and addressing the concerns raised by

Plaintiff's attorney.  (<u>Id.</u> at 32, Ex. 77.)  The Appeal Specialist noted in the letter that the Rider

stated that the Policy and Rider "shall be treated as one instrument" and explained that

> The Rider refers back to the Policy, regarding the definition of
> occupation ("Insured's occupation as defined in this policy.")  The
> definition of occupation in the policy clearly provides for a change
> in definition of occupation, after age 55 or after 120 months of

---

[7] Plaintiff argues that Court should also consider as evidence "over 180 separate documents that
were submitted by [Plaintiff] to [Defendant] as part of his appeal" of Defendant's determination
that he was no longer entitled to residual disability benefits.  (Pl.'s Resp. Opp'n Def.'s Mot.
Summ. J. 18.)  Defendant argues that the 180 documents consist of "4,055 pages of unrelated,
irrelevant and inappropriate documents" which were "never part of [the administrative record]
and where Plaintiff, himself, has not produced nor cited with any specificity a single one of these
documents as relevant in any way whatsoever."  (Def.'s Reply 2.)
    Plaintiff responds by arguing that Defendant chose "unilaterally" to exclude those
documents from the administrative record because "much of this documentation is not relevant
to the evaluation of your client's eligibility for benefits.  As such, these irrelevant documents will
be maintained under a tab separate from the documents that were, in fact, relevant to (and were
reviewed and considered in) this evaluation."  (Pl.'s Mem. Supp. Resp. to Def.'s Reply 3–4.)
Plaintiff explains that "the documents contained on the CD would provide important and relevant
evidence on the issues of bias and conflict of interest in the claims process," which Plaintiff
asserts he would have relied on in opposing any argument Defendant might have made
suggesting that the arbitrary and capricious or abuse of discretion standard of review applied to
Plaintiff's ERISA claim.  (<u>Id.</u> at 4–5.)
    It is not clear whether Plaintiff has abandoned his argument that the 180 documents
should have been made part of the administrative record in light of the parties' joint stipulation
that the Court should apply a de novo standard of review.  As discussed below, the parties'
summary judgment motions can be decided on the basis of the language in the Policy and the
Rider, and therefore the inclusion or exclusion of those documents would not change the
outcome of this case.

> benefits have been paid [whichever is longer].  The policy is not ambiguous in this regard.
>
> The notation by the DBS, in the Action Plan, that the Residual provision "has no change in definition" was an isolated and incomplete reference.  The provisions of the policy were subsequently clarified for the DBS, who then handled the claim appropriately, in light of the provisions of the policy.
>
> Based on a full, fair, and impartial appellate review, the information in your client's claim file supports that he is able to perform the duties of alternate gainful occupations, and is in fact performing all duties of his current (gainful) occupation.  The decision to deny further benefits on his claim is appropriate.

(Id. at 32–33, Ex. 77.)

Plaintiff filed a Complaint on June 14, 2013.  Defendant and Plaintiff each moved for Summary Judgment on August 5, 2014, and each filed their respective Response in Opposition on September 5, 2014.  Defendant submitted an Appendix comprising the Administrative Record in Plaintiff's case on August 5, 2014.  Defendant filed a Reply on September 24, 2014.  Plaintiff filed a Supplemental Memorandum of Law in Response to Allegations Made in Defendant's Reply Memorandum of Law on October 3, 2014.  As the briefing process has been exhausted, both Plaintiff's and Defendant's Motions for Summary Judgment are now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is

entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

Plaintiff alleged that Defendant violated Section 1132(a)(1)(B) of ERISA by "improperly terminat[ing] [his] residual disability insurance benefits by arbitrarily and capriciously failing to investigate, review and decide his claim fairly and properly and by violating ERISA, its supporting regulations, federal common law of ERISA, and Pennsylvania common law regulating the construction and interpretation of insurance contracts," which resulted in Plaintiff being denied "the residual disability insurance benefits to which he is entitled under the Disability Policy, all in violation of ERISA."  (Compl. ¶¶ 112–13.)

The parties agreed, via a Joint Stipulation on the Standard of Review, that the Court should apply a de novo standard of review.  (Docket No. 13.)  When a court "exercise[s] de novo review, the role of the court is to determine whether the administrator . . . made a correct decision."  Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413–14 (3d Cir. 2011) (citations and quotations omitted).  The "administrator's decision is accorded no deference or presumption of correctness."  Id. at 413–14 (citations and quotations omitted).  "The court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."  Id. at 414 (citations and quotations omitted). "This determination may be based on any information before the administrator initially . . . as well as any supplemental evidence."  Id. at 418 (quotations omitted) (citing Luby v. Teamsters Health, Welfare, and Pension Funds, 944 F.2d 1176, 1184–85 (3d Cir. 1991) ("[A] district court

exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's administrator.")).  However, "[i]f the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a de novo review of the record of the administrator's decision, making its own independent benefit determination."  Luby, 944 F.2d at 1185 (internal citation omitted).

Here, the administrative record of over four thousand pages has been sufficiently developed, making the Court's consideration of supplemental evidence unnecessary in conducting a de novo review.  Furthermore, a determination of whether the administrator properly interpreted the plan, and whether Plaintiff is entitled to the relief he seeks, can be made based on the language in the Policy and the Rider.  Accordingly, additional evidence beyond that contained in the administrative record is not required.[8]

## A.  **The Plan Language**

Plaintiff argues that he is entitled to summary judgment because the language in the Policy is ambiguous and the Court, therefore, should apply the Pennsylvania common law rule of *Contra Proferentem*[9] and construe the Policy in Plaintiff's favor.  Defendant argues that the language in the Policy is not ambiguous and that *Contra Proferentem* does not apply in this case.

---

[8] See supra note 7.

[9] "Under [the doctrine of *Contra Proferentem*], if, after applying the normal principles of contractual construction, an insurance contract is fairly susceptible of two different interpretations, . . . the interpretation that is most favorable to the insured will be adopted." Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 (3d Cir. 1993) (emphasis added) (internal citations and quotations omitted).  Defendant argues that the Pennsylvania state law doctrine of *Contra Proferentem* does not apply, both because the Policy and the Rider are unambiguous and because federal common law of ERISA would apply as a gap-filler if needed to interpret the Policy.  (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 18–28.)  As the Court finds that the language of the Policy and the Rider at issue in this case is not ambiguous, additional analysis under *Contra Proferentem* or under the federal common law of ERISA is not needed.

As a preliminary matter, the Court must determine whether the language in the Policy is ambiguous.  "'Whether an ambiguity exists is a question of law.'" Viera, 642 F.3d at 419 (quoting 12th St. Gym, Inc. v. Gen. Star Indem. Co., 93 F.3d 1158, 1165 (3d Cir. 1996)). Notably, "'[d]isagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous.'"  Id. (quoting 12th St. Gym, 93 F.3d at 1165.)  Ultimately, "[w]here there is only one reasonable interpretation of a contract, that interpretation controls because 'straightforward language in an insurance policy should be given its natural meaning.'"  Id. at 419–20 (quoting Lawson, 301 F.3d at 162.)

Plaintiff argues that the Policy is ambiguous because 1) the term "the Insured's occupation" is not defined in the Residual Disability Rider and 2) the term "the Insured's occupation" does not explicitly appear as such anywhere in the Total Disability coverage, rather than "occupation," which does appear.  (Pl.'s Mem. Supp. Mot. Summ. J. 9.)  Plaintiff argues further that the "two-part definition of the term 'occupation'" in the Policy "establishes that the terms 'occupation' [as used in the Policy] and 'the Insured's occupation' [as used in the Rider] are not synonymous."  (Id. at 10.)  According to Plaintiff, there is, therefore, a reasonable basis to conclude that there is no change in definition in the Rider's term "the Insured's occupation." (Id. at 10–11.)  Defendant argues that, as "Plaintiff admits in paragraph 13 of his Complaint[10] that the *only* definition of the Insured's occupation to be used with the Policy's attached Rider is found in the Policy," "a straightforward, plain reading of the Rider in conjunction with the Policy makes the change in definition applicable to an insured, like [Plaintiff], receiving residual disability benefits."  (Def.'s Mem. Supp. Mot. Summ. J. 19 (emphasis in original).)

---

[10] "The only definition provided for the term 'the Insured's occupation' as used in the Disability Policy's Rider for Residual Disability Income Benefit is 'the occupation of the Insured at the time such disability begins' [as quoted in the Policy]."  (Compl. ¶ 13.)

In this case, the Policy language is clear and unambiguous.  As Defendant points out, "the only definition of the Insured's occupation to be used with the Policy's attached Rider is to be found in the Policy."  (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 22.)  The Residual Disability Rider states that "[t]his rider, while in force, and the policy shall be treated as one instrument. The terms of the policy shall apply to this rider unless the rider states otherwise."  (Def.'s Statement of Facts, Ex. 3.)  The Rider defines Partial Disability as the inability "1) to perform one or more of the important daily duties of the Insured's occupation as defined in this policy; or 2) to engage in the Insured's occupation as defined in this policy for as much time as was usual prior to the start of disability."  (Id.)  The Policy states that "[u]ntil an income benefit, for any period of continuous disability, has been paid to the Insured's fifty-fifth birthday, or for 120 months, whichever is longer, occupation means the occupation of the Insured at the time such disability begins.  Thereafter it means any occupation for which the Insured is or becomes reasonably fitted by education, training or experience."  (Id.)  In other words, when read together, those sections of the Policy and Rider mean that, prior to his fifty-fifth birthday, Plaintiff's occupation was that of chiropractor, and after his fifty-fifth birthday, it became any occupation for which Plaintiff is suited, in this case a medical director for an insurance company. Plaintiff's reading invents an unnecessary distinction between the meaning of "occupation" of the insured and "the Insured's occupation" that is not compatible with the plain language of the Rider, which ties the definition of "the Insured's occupation" to that as is "defined in this policy."  When the Policy and Rider are read together, as the Rider instructs, Defendant's interpretation is the only reasonable interpretation and is controlling here because it gives the "straightforward language" in the Policy "its natural meaning."  Viera, at 419–20.  While Plaintiff disagrees with Defendant's reading, the language at issue is not ambiguous and

Defendant properly interpreted the Policy and the Rider.  See 12th St. Gym, 93 F.3d at 1165;

Viera, 642 F.3d at 414

Plaintiff, relying on the February 8, 2011 file notation in which Garry wrote that the

residual disability provision has no change in definition, argues that "[i]f Jason Garry concluded

at any time that Dr. Bowerman's Residual Disability Rider "has no change in definition" then

this is definitive proof that there is a reasonable, alternative interpretation of the term "the

Insured's occupation" as used in the Residual Disability Rider."  (Pl.'s Mem. Supp. Mot. Summ.

J. 12 (emphasis in original).)  As Defendant points out, however, an "initial, early mistake by Mr.

Garry is inconsistent with all other references throughout the claim by multiple representatives of

Defendant" (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 27), and does not prove that the Policy and

the Rider are ambiguous as a matter of law.  Indeed, the note Garry made after first receiving

Plaintiff's file does not definitively prove that "the Insured's occupation" has a different meaning

than "occupation," but rather reflects that he neglected to refer back to the Policy in interpreting

the Rider's implications for the continuation of benefits past age fifty-five.  That oversight does

not mean that the Policy and the Rider are ambiguous.

Plaintiff also relies on various letters from Defendant's employees to argue that those

employees' statements about the administration of Plaintiff's claim provide evidence that there is

more than one reasonable interpretation of the Policy.[11]  (Pl.'s Mem. Supp. Mot. Summ. J. 11–

---

[11] In addition to the letters discussed above, Plaintiff also relies on a 1986 letter from one of
Defendant's employees written in response to Plaintiff's request for an explanation of benefits as
evidence that there is more than one reasonable interpretation of the Policy.  (See Pl.'s Statement
of Facts, Ex. 2.)  In the letter, Defendant's employee explains how an occupation is determined
at the commencement of a claim.  Defendant argues that an explanation of how "occupation" is
determined at the commencement of a claim is not evidence that in 1986, prior to Plaintiff ever
filing a claim and prior to Plaintiff reaching age fifty-five, Defendant's understanding of the
change in definition provision was different than it is now and that, therefore, there is more than
one reasonable interpretation of the Policy.  (See Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 26.)
Moreover, Defendant argues that the employee's letter cannot modify the terms of the Policy or

15.)  Plaintiff maintains that the absence of a discussion of how the Policy and the Rider interact specifically with respect to "occupation" and the change in definition in certain of those letters must lead to the conclusion that the Policy is ambiguous (id. at 13–15), because "[h]ow hard would it have been for Mr. Garry in any of these letters to state clearly and unambiguously that the 'change in definition' occurring [in July 2011] with respect to the definition of Total Disability also simultaneously works the same change on the definition of Partial Disability?" (Id. at 15.)  The letters Plaintiff relies on, however, were written for the purpose of making specific document requests related to the handling of Plaintiff's claim, seeking specific information from Plaintiff regarding his various forms of income and the amount of work he was performing as a chiropractor at the time the letters were written, and providing explanations in response to questions Plaintiff raised throughout the course of his correspondence with Garry. While in hindsight, and in light of the current dispute, it may have been helpful for the letters to include a primer on how to read all the provisions together, the absence of such language neither renders the Policy ambiguous nor mandates that the clear meaning of the Policy and the Rider be ignored.

        As the language of the Policy and the Rider are clear and unambiguous with respect to the application of the definition of occupation and the change in definition provision, the Court must give effect to that language.  See Viera, 642 F.3d at 419.  Having found that the Policy and the Rider are unambiguous, the Court will review whether Defendant correctly determined that Plaintiff was no longer entitled to continued benefits under the Policy after his fifty-fifth birthday.

---

the Rider, as she was not authorized to do so under the terms of the Policy.  (Id.)  As the 1986 letter was written three years before Plaintiff was injured and filed a claim, it does not demonstrate either that the Policy and Rider are ambiguous or that Defendant has changed its understanding of those documents in order to terminate Plaintiff's benefits.

**B.  Whether Plaintiff Was Entitled to Continued Benefits Under the Plan**

Defendant asserts that its determination that Plaintiff did not meet the Policy's terms, definitions, and requirements for continued residual disability benefits once he turned fifty-five was correct and should not be disturbed.  Specifically, Defendant argues that because "[Plaintiff], whose 'own occupation' was Chiropractor on the date of the bicycle accident in 1989, was gainfully employed, not only as a Chiropractor (his 'own occ') but also in a Medicolegal business and as a Medical Director at Independence Healthcare Management-Independence Blue Cross (both gainful 'any occs') over two decades later on his 55th birthday at the change in definition of disability, he no longer met the definition for residual disability income benefits and these benefits were properly terminated."  (Def.'s Mot. Summ. J. ¶ 10.)  Based on the language of the Policy and the Rider, the Court agrees.  Defendant was no longer entitled to disability benefits because he no longer met the definition for partial disability in the Rider, as that definition incorporates the definition of occupation as defined in the Policy, which contains the "change in definition" provision which took effect when Plaintiff turned fifty-five.  As Plaintiff was, at that time, engaged in "any occupation for which the Insured is or becomes reasonably fitted by education, training, or experience," he was no longer unable to perform the duties of "any occupation," in this case his full-time work as a Medical Director.  (See Def.'s Statement of Facts, Ex. 3.)  Defendant's determination that Plaintiff was no longer entitled to disability benefits or the premium waiver under the Policy and the Rider was correct.

Plaintiff argues that Defendant engaged in "moving the target" [12] in order to place Plaintiff into a category to which the change in definition applies.  Specifically, Plaintiff

---

[12] Plaintiff relies on numerous cases from outside the Third Circuit which have found that changing grounds for denial of benefits constitutes "moving the target" and is an abuse of discretion.  (See Pl.'s Mem. Supp. Mot. Summ. J. 25–26.)

interprets Garry's letters to Plaintiff as containing a finding by Defendant that Plaintiff was totally disabled at the time of Plaintiff's fifty-fifth birthday in order to invoke the change in definition, and characterizes Defendant's explanation for upholding its determination to terminate benefits on appeal as "moving the target" by stating that the change in definition also applied to partial disability benefits under the Rider.  (See Pl.'s Mem. Supp. Mot. Summ. J. 23–27; Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 14–16.)  In spite of Plaintiff's characterization of the content of Garry's letters as a "finding" of total disability, it appears that the letters are actually part of Defendant's effort to determine whether 1) Plaintiff should be considered partially disabled or totally disabled as a chiropractor, based on the amount of time he worked as a chiropractor relative to the amount of time he worked in other capacities, and 2) whether Plaintiff's low level of hours spent working as a chiropractor resulted from his disability caused by the 1989 bicycle accident, or because Plaintiff chose to devote more time to his other work. Letters reflecting Defendant's attempts to clarify Plaintiff's status as either partially or totally disabled, or not disabled at all, are not "findings" or evidence of "moving the target" as Plaintiff has argued.[13]  Moreover, under the terms of the Policy and the Rider, it would not have mattered, with respect to the change in definition provision, if Defendant had determined that Plaintiff was totally disabled instead of continuing to treat his claim under partial disability status, because the change in definition would apply in either instance.  Plaintiff's "moving the target" argument,

---

[13] Plaintiff argues that Defendant "would have to explain how its own claims personnel failed so utterly in not raising [Defendant's interpretation of the Policy and Rider] at the first opportunity" in order to avoid having the cited correspondence serve as evidence of additional possible interpretations of the Policy and the Rider.  (Pl.'s Mem. Supp. Mot. Summ. J. 27.)  These letters however, as explained above, were intended to respond to specific questions from Plaintiff and to obtain clarifying details from Plaintiff about the number of hours worked as a Chiropractor and the reasons behind any decrease in hours worked.  Again, the fact that the letters did not address the un-asked question of how the provisions of the Policy and the Rider interact to govern the issues now being litigated is not evidence that the Policy or the Rider are themselves ambiguous or subject to multiple reasonable interpretations.

therefore, is not persuasive and does not change the fact that Defendant's determination that Plaintiff was no longer entitled to benefits was based on a correct interpretation of the Policy and the Rider.

For the reasons described in the above discussion, Defendant's termination of Plaintiff's disability benefits as of Plaintiff's fifty-fifth birthday was correct, and summary judgment for Defendant is appropriate.  Accordingly, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied.

### C.  Defendant's Twenty-Sixth Affirmative Defense

Plaintiff asserts that he is entitled to summary judgment on Defendant's Twenty-Sixth Affirmative Defense, which states:

> **TWENTY-SIXTH AFFIRMATIVE DEFENSE AND BY WAY OF EQUITABLE SETOFF AND/OR RECOUPMENT**
>
> Pursuant to Disability Insurance Policy provisions, particularly the definition of Earnings Per Month, which does not restrict Earnings Per Month to only those Earnings earned in his occupation, but rather, inter alia, "all wages, fees and other pay earned by the Insured in a month for work done by the Insured," it appears that disability benefits under Plaintiff's claim may have been substantially overpaid by [Defendant] entitling [Defendant] to an equitable setoff or recoupment.

(Pl.'s Mem. Supp. Mot. Summ. J. 22; Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 17 (quoting Def.'s Answer at 25–26).)  Specifically, Plaintiff argues that "[u]ntil such time as [Defendant] dismisses **with prejudice** its Twenty-Sixth Affirmative Defense, [Plaintiff] should be entitled to a judicial ruling on this defense," noting that ERISA Section 1132(a)(1)(B) provides that plan participants are entitled to clarify their rights to future benefits under the terms of the plan.[14]  (Id. (emphasis

---

[14] It should be noted that Plaintiff is requesting clarification on his right to retain benefits already paid to him in the past, rather than a clarification of his rights to future benefits under the plan as provided for in the quoted ERISA provision.

in original) (citing 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.").)  According to Plaintiff, if "[he] prevails on his core benefits claim, he should not be compelled in the future to re-litigate [Defendant's] claimed right to set-off and/or recoup non-chiropractic earnings."  (Id.)  By way of response, Defendant notes that it did not file a counterclaim, and that Defendant "is voluntarily choosing not to seek recoupment of the overpaid *past* benefits at this time.  However, should Plaintiff return to claim status [Defendant] reserves its right to review and determine any ongoing claim under the terms of the Policy and the facts extant regarding 'Earnings Per Month' at that time."  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 29 (emphasis in original).)  Defendant "has not moved for [recovery of overpaid benefits] in its Motion for Summary Judgment," and the claims administrator did not reach a determination regarding overpayment.[15]  (Id. at 16–17.)

    As Defendant has not filed a counterclaim regarding this issue, and as Plaintiff has not moved to strike Defendant's Twenty-Sixth Affirmative Defense, there is no claim regarding that issue on which to grant or deny summary judgment and no action from the Court is needed.

### D.  Plaintiff's Argument that Defendant's Interpretations of the Policy Render Coverage Illusory

    Plaintiff argues that applying Defendant's interpretations of the terms "the Insured's occupation as defined in this policy" and "Earnings per Month" would "render illusory any further coverage under the Residual Disability Rider to [Plaintiff] now that he has passed his 55th

---

[15] Defendant's letter to Plaintiff's counsel explaining its decision on appeal noted that in reviewing Plaintiff's file, it had come to Defendant's attention that the definition of Earnings Per Month in Plaintiff's Policy did not exclude earnings other than those from the occupation Plaintiff held at the time his disability commenced, and that therefore Defendant believed it had substantially overpaid benefits pursuant to Plaintiff's claim.  (Def.'s Statement of Facts Ex. 77.)

birthday." (Pl.'s Mem. Supp. Mot. Summ. J. 27.) Plaintiff's concern is that "[u]nder [Defendant's] interpretations no matter what occupation [Plaintiff] may become disabled in because of illness or accident in the future, [Defendant] will always be entitled to substitute a different occupation that it determines he can still perform full time and its income in order to defeat such a Residual Disability Claim." (Id. at 28.) Defendant responds by pointing out that Plaintiff is now covered under the terms of the Policy for "any occ," whereby "[i]f he suffers a new disability and is unable to work in his then gainful occupation he could, hypothetically, be found to meet the definition of disability and conceivably be entitled to residual or total disability benefits." (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 32–33.) In other words, if Plaintiff were injured and thereafter unable to work in, or perform one or more of the duties of, "any occupation for which the Insured is or becomes reasonably fitted by education, training or experience," and he met the other conditions in the Policy and Rider for total or partial disability, he could receive benefits under the Policy. Plaintiff's illusory coverage argument is therefore unavailing.

**E. Defendant's Request to Seek Leave to File an Application for Attorney's Fees and Costs**

Defendant seeks leave to file an application for attorney's fees and costs under 29 U.S.C. § 1132(g)(1), which states that "[i]n any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132 (g)(1). The Court does not believe that attorney's fees would be appropriate even though Plaintiff's Motion against Defendant was not successful. Plaintiff's arguments were not indefensible or totally lacking in merit so as to be frivolous.

**IV.     CONCLUSION**

Having reviewed the briefs and pleadings and their exhibits, and having reviewed the arguments of counsel, the Court finds that Plaintiff has not set forth evidence that would enable a jury to reasonably find in his favor, whereas Defendant has clearly established an entitlement to judgment in its favor.  Accordingly, the Court shall grant Defendant's Motion for Summary Judgment in its entirety, and shall deny Plaintiff's Motion for Summary Judgment in its entirety. No attorney's fees are awarded.

An appropriate Order follows.